**Leon Rutherford KING, Petitioner-Appellant,**

v.

**James A. LYNAUGH, Director, Texas Department of Corrections, Respondent-Appellee.**

**No. 86–2006.**

United States Court of Appeals, Fifth Circuit.

Sept. 14, 1987.

Order Granting Rehearing En Banc Nov. 4, 1987.

Ken J. McLean, Houston, Tex., for petitioner-appellant.

Paula C. Offenhauser, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before RUBIN, JOHNSON, and JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

In this capital case, a Texas inmate appeals from the district court's order denying his petition for habeas corpus relief under 28 U.S.C. § 2254. Because the petitioner's eighth and fourteenth amendment right to exercise voir dire challenges knowingly was infringed when the state trial court refused to allow him to ask questions directed towards determining whether veniremembers harbored misconceptions about Texas parole law that might bias them in favor of capital punishment, he has a right to be resentenced.

I.

On October 16, 1978, Leon Rutherford King was convicted of the capital murder of Michael Clayton Underwood and sentenced to be executed. The facts of the crime are recounted by the Texas Court of Criminal Appeals in *King v. State,* 631 S.W.2d 486 (Tex.Crim.App.1982) (en banc).

King's original conviction was overturned by the Texas Court of Criminal Appeals on February 6, 1980, and a retrial was ordered.[1] In May 1980, King was convicted and sentenced to death a second time. That conviction was affirmed by the Texas Court of Criminal Appeals,[2] and King's subsequent petition for a writ of certiorari was denied by the Supreme Court.[3] King then sought collateral review of his conviction in the state courts, with no success. His ensuing federal habeas corpus petition was denied by federal district court in 1986, but King was granted a certificate of probable cause to appeal and now does so.[4]

King raises three issues concerning the constitutionality of his second trial. He contends: (1) the trial court violated his sixth and fourteenth amendment rights by failing to permit him to conduct voir dire directed toward discovering whether veniremembers harbored serious misconceptions about Texas parole law that might have biased them in favor of capital punishment; (2) his trial was rendered unfair and his entitlement to a presumption of innocence defeated when two jurors saw him bound in handcuffs on the second day of his trial during an emergency evacuation of the courthouse due to a fire; and (3) he was denied his rights under the eighth and fourteenth amendments by the trial court's refusal to allow him to conduct his own defense during the penalty phase of his trial.

II.

King contends that the voir dire he requested was necessary to dispel the common misconception that a life sentence might result in incarceration for only nine to ten years and to permit him to use peremptory challenges against prospective jurors whose erroneous assumptions about parole law might have biased them in favor of imposing the death penalty.

1. *King v. State,* 594 S.W.2d 425 (Tex.Crim.App. 1980) (en banc).

2. *King v. State,* 631 S.W.2d 486 (Tex.Crim.App. 1982) (en banc).

3. *King v. Texas,* 459 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982).

4. *King v. McCotter,* 795 F.2d 517 (5th Cir.1986).

The state contends that King's claims are premised on the erroneous assumption that a jury instruction on parole issues is constitutionally mandated in capital cases. Under Texas law in effect at the time of King's trial [5] courts were precluded in all cases from giving jurors instructions on the Texas parole eligibility law. The constitutionality of this rule, Texas argues, has been confirmed in *O'Bryan v. Estelle.* [6] In *O'Bryan,* a panel of this court held that the due process clause does not give capital defendants the right to an instruction about the possibility of parole for a person sentenced to life imprisonment. King's characterization of his claim as a challenge to an impermissible restriction on voir dire, the state continues, merely restates the issue in different terms because King can claim no right to accomplish through voir dire what he may not accomplish with a jury instruction.

Even if the state is correct in asserting that *O'Bryan* forecloses King's claim that he is constitutionally entitled to a jury instruction on parole law upon request, however, it does not follow that King is not entitled to inquire about preconceptions of parole law harbored by veniremembers so that he can, at least, exercise his peremptory challenges knowingly.

■ The right to an impartial jury is basic to our system of justice.[7] This right carries with it the concomitant right to take reasonable steps designed to ensure that a jury is impartial. Perhaps the most important device to serve this end is the jury challenge,[8] a device based on voir dire examination.[9] Although the proper scope of voir dire is generally left to the sound discretion of the trial court,[10] that discretion is not unfettered. Limits on voir dire that create an unreasonable risk of bias or prejudice infecting the trial process violate due process.[11]

The Supreme Court has recognized "that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." [12] The severity of the punishment is, however, not the only factor dictating that voir dire in capital cases be closely scrutinized. In such cases an accused's right to an impartial jury also must be more carefully safeguarded because capital juries are called upon to make a "highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves.' " [13] Because of the range of discretion entrusted to juries in capital cases, a unique opportunity exists for bias to operate undetected.[14] The Court, therefore, has struck down capital sentences whenever it has found that the circumstances under which they were imposed created an unacceptable risk that the death penalty may have been imposed "arbitrarily or capriciously" or through "whim ... or mistake." [15]

---

5. *See, e.g., Munroe v. State,* 637 S.W.2d 475, 476–77 (Tex.Crim.App.1982) (en banc).

6. 714 F.2d 365, 388–89 (5th Cir.1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). *See also Andrade v. McCotter,* 805 F.2d 1190 (5th Cir.1986); *Turner v. Bass,* 753 F.2d 342 (4th Cir.1985), *rev'd on other grounds,* 476 U.S. 1, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).

7. *See, e.g., Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1767, 90 L.Ed.2d 137 (1986).

8. *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894).

9. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 1719 n. 12, 90 L.Ed.2d 69 (1986).

10. *See Ristaino v. Ross,* 424 U.S. 589, 595, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976).

11. *See Turner v. Murray,* 476 U.S. 1, 106 S.Ct. 1683, 1687, 90 L.Ed.2d 27 (1986); *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973).

12. *California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983).

13. *Caldwell v. Mississippi,* 472 U.S. 320, 340–41 .n. 7, 105 S.Ct. 2633, 2645–46 n. 7, 86 L.Ed.2d 231 (1985) (quoting *Zant v. Stephens,* 462 U.S. 862, 900, 103 S.Ct. 2733, 2755, 77 L.Ed.2d 253 (1983) (Rehnquist, J., concurring)).

14. *Turner,* 476 U.S. at ——, 106 S.Ct. at 1687.

15. *Id.* at ——, 106 S.Ct. at 1688 (citing *Caldwell,* 472 U.S. 320, 105 S.Ct. at 2647, 86 L.Ed.2d 231 (1985) (O'Connor, J., concurring in part and concurring in judgment)).

The significance of the information King sought to discover is clear. A juror might decline to impose the death penalty if the alternative were confinement of the criminal for life without possibility of parole because the general public would be adequately protected by such a life sentence. Similarly, a juror might decline to impose the death penalty on a particular defendant if he believed that the individual to be sentenced would no longer represent a menace if he were confined for at least twenty years without parole for the crime he committed. If, on the other hand, a juror believed it were likely—or even possible—that a convicted person would be released in a few years and the juror believed that the criminal would then still constitute a hazard to the public, that juror might conclude that only the death penalty would adequately ensure public safety.

■ Because widely held misconceptions about the actual effect of imposing a life sentence raise an unacceptable risk that the death penalty may be imposed on some defendants largely on the basis of mistaken notions of parole law, defendants in capital cases are at least entitled to determine whether such misconceptions are held by veniremembers and to exercise peremptory challenges to protect themselves against the effects of error. The state contends that, by instructing the jury that parole "is no concern of yours" and is not to be considered, the court benefitted King by essentially telling the jury that "life means life." If a misconception exists, no instruction that merely directs jurors to disregard issues of parole in making their sentencing determination can erase that fallacy from their minds. That voir dire could easily minimize the risk to the accused created by this misconception strengthens King's claim to constitutional protection from the potential ramifications of failing to strike a juror who harbors a mistaken belief.[16]

■ As the dissent points out, the scope of voir dire has been consistently and correctly held to be within the discretion of the trial court. The Supreme Court cases evaluating the voir dire of veniremembers exposed to adverse pretrial publicity,[17] however, support our view that the ambit of this discretion does not extend to prohibiting a defendant whose life is at stake from inquiring about misconceptions or preconceptions that might bias the jury so as to exercise intelligently his peremptory challenges. In *Patton v. Yount*, the most recent of the pretrial-publicity cases, the Court stressed that trial judges, who observe and participate in voir dire, are best placed to assess a veniremember's impartiality and that a factual finding of impartiality should, therefore, be presumed correct.[18] Nonetheless, the court reaffirmed that, had "the jurors at Yount's trial had such fixed opinions that they could not judge impartially the guilt of the defendant,"[19] Yount would have been deprived of a fair trial and stripped of his right to due process.[20] Following the logic of Supreme Court precedent, this court has held that when the record reveals a significant possibility that pretrial publicity prejudiced the venire the district court is obligated to conduct individual voir dire to assure impartiality.[21] If preconceptions based on unreliable pretrial publicity might so bias a jury as to taint the trial, then misconceptions about the possibility of early parole might so bias a jury as to undermine due process in a capital sentencing proceeding, making adequate voir dire necessary to afford the defendant "reasonable assurance that prejudice would [have been] discovered if present."[22]

16. *See Id.* at ——, 106 S.Ct. at 1688.

17. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

18. 467 U.S. at 1036–38, 104 S.Ct. at 2891–92.

19. *Id.* at 1035, 104 S.Ct. at 2891.

20. *See also Irvin,* 366 U.S. at 722, 81 S.Ct. at 1642.

21. *United States v. Hawkins,* 658 F.2d 279, 282–85 (5th Cir.1981).

22. *Id.* at 285 (quoting *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976)).

In addition to assessing the adequacy of voir dire in highly publicized cases, this circuit has before addressed questions about the accused's right to inquire about veniremembers' understanding of the law. In *Moreno v. Estelle,* [23] Moreno sought habeas corpus relief from his conviction for aggravated assault and from his life sentence under the enhancement provisions of the Texas habitual offender statute.[24] He contended that he had been denied a fair trial by an impartial jury because the trial court had refused to allow him to question prospective jurors about their willingness to impose an enhanced sentence should this be required. He argued that Texas law clearly established his right to conduct such voir dire. This court deferred to the Texas Court of Criminal Appeals' holding that the trial court's error of state law in restricting voir dire had been rendered harmless by its later jury charge.[25] The opinion went on to say that Moreno's challenge to the restriction of voir dire presented no federal constitutional question but was purely a matter of state criminal procedure.[26] That Moreno had no federal right to question veniremembers about their view of enhanced punishment does not mean that King had no right to conduct voir dire on parole law. *Moreno* involved the jurors' willingness to follow the requirements of the Texas habitual offender statute, but a trial judge's admonition to jurors to follow the law as stated obviates the need for specific inquiry into their views on every law relevant to trial or sentencing.[27] In this case, however, both the voir dire and the trial judge's instructions were inadequate to dispel biasing misconceptions about parole law, in part because Texas law prohibits jury instructions

on parole. This prohibition makes adequate voir dire all the more important.

A more recent case, *Milton v. Procunier,* [28] is distinguishable on similar grounds. Milton challenged the voir dire leading to his capital conviction, arguing that the trial judge had improperly excluded questions about veniremembers' understanding of the terms "deliberately," "probability," and "criminal acts of violence." [29] This court found no abuse of discretion because the voir dire taken as a whole was "painstaking" and because in the context of the voir dire and the jury instructions, the allegedly ambiguous terms took on sufficiently precise meanings to afford the jury the guidance required in capital cases.[30] King did not have the benefit of such clarification. If jurors began with an unfounded fear that a life sentence might result in early parole, they ended with that fear. Thus, while the requested voir dire may have been superfluous in *Moreno* and *Milton,* it was essential here.

█ Our determination that King was improperly denied an opportunity to conduct voir dire on issues that might influence the sentencing phase of his trial raises a second important issue: whether, under federal law, this infringement on the voir-dire process requires reversal of King's conviction or merely resentencing. In *Turner v. Murray,* [31] a capital defendant charged with an interracial killing challenged the refusal of the state trial court to conduct voir dire regarding prospective jurors' racial biases. A plurality of the Supreme Court, joined by Chief Justice Burger concurring in the result, held that the

**23.** 717 F.2d 171 (5th Cir.1983), *cert. denied,* 466 U.S. 975, 104 S.Ct. 2353, 80 L.Ed.2d 826 (1984).

**24.** *Id.* at 172–73.

**25.** *Id.* at 178–79.

**26.** *Id.* at 179.

**27.** *See United States v. Williams,* 573 F.2d 284, 287–88 (5th Cir.1978); *United States v. Ledee,* 549 F.2d 990, 991–92 (5th Cir.1977), *cert. denied,* 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977).

**28.** 744 F.2d 1091 (5th Cir.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

**29.** *Id.* at 1095.

**30.** *Id.* at 1096. *Accord Esquivel v. McCotter,* 777 F.2d 956, 957 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1662, 90 L.Ed.2d 204 (1986).

**31.** 476 U.S. 1, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986).

decision of the trial court created an unacceptable risk that racial prejudice would infect the sentencing proceeding but that the imperatives requiring intervention in the sentencing phase of the trial were not sufficiently involved in the guilt phase to require retrial of that issue.[32] Because the risk that the trial court's refusal to permit King to conduct voir dire regarding jurors' preconceptions about Texas parole law does not, under the circumstances of this case, create substantial risk that the guilt phase of his trial was tainted by juror bias, resentencing is a sufficient remedy under federal law.

### III.

King also asserts that he was entitled to a jury instruction concerning the minimum duration of a life sentence in Texas. Although he did not request such a charge, he excuses his failure to do so by arguing that such a request would have been futile after the trial court had denied him even the opportunity to conduct voir dire on the parole issue. His failure to make the request may foreclose his right now to raise the issue,[33] but the controversy is not moot. Because recent changes made by the Texas legislature that now require parole instructions for certain felonies explicitly exclude capital offenses,[34] the issue will arise again at resentencing.

### A.

The decision in *O'Bryan v. Estelle*[35] that due process does not entitle a defendant to an instruction on parole in capital cases represents a substantial leap from the principles enunciated by the Supreme Court in *California v. Ramos*.[36] In *Ramos*, the

Supreme Court determined that a court might instruct a jury without violating a defendant's constitutional rights that a sentence of life without possibility of parole was commutable by the governor. The Court noted, however, that its determination that a state may inform jurors of the governor's power to commute sentences was "not intended to override the contrary judgment of [other] state legislatures.... It is elementary that States are free to provide greater protections in their criminal justice system than the Federal Constitution requires.... We hold only that the Eighth and Fourteenth Amendments do not prohibit such instruction."[37] Although the Court rejected Ramos's contention that the state must also inform the jury that the governor may commute death sentences if it permits instructions on commutation of life sentences without parole, it did so because such information would not mitigate the likelihood that death would be the sentence chosen.[38] This cannot be said about the instruction King seeks. When sentencing jurors may harbor the type of misconceptions about parole law King describes, the instruction he requests, unlike the instruction demanded in *Ramos*, would certainly mitigate against imposition of the death penalty.

In deciding *Ramos*, the Supreme Court confronted a different issue: whether a capital defendant is constitutionally entitled to have accurate, potentially aggravating information relevant to sentencing determinations excluded from jury consideration. O'Bryan's and King's challenges were directed toward state policy *precluding* them from introducing equally accurate information that they believe mitigates against the death penalty under the circumstances of their cases. As the Supreme

---

**32.** *Id.* at ——, 106 S.Ct. at 1688–89.

**33.** *See Riles v. McCotter,* 799 F.2d 947, 952 (5th Cir.1986); *O'Bryan v. Estelle,* 714 F.2d at 385. *See also Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); Tex.Code Crim.Proc.Ann. arts. 36.14, 36.15 (Vernon Supp. 1987).

**34.** *See* Tex.Code Crim.Proc.Ann. art. 37.07 § 4 (Vernon Supp.1987).

**35.** 714 F.2d at 388–89.

**36.** 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

**37.** *Id.* at 1013–14, 103 S.Ct. at 3459–60.

**38.** *Id.* at 1010–12, 103 S.Ct. at 3458–59.

Court held in *Hicks v. Oklahoma,*[39] a defendant's interest in the exercise of the jury's discretion in imposing punishment is a liberty interest protected by due process. A state's decision to impinge on jury discretion in a capital case by precluding the defendant from informing jurors of the practical meaning of their sentencing options violates that interest.

### B.

*O'Bryan* is distinguishable from this case in considering only whether a requested parole instruction is required by due process whereas King has challenged the Texas rule on both due process and eighth amendment grounds. Although eighth amendment jurisprudence contradicts the rationale of *O'Bryan,* the *O'Bryan* reasoning is derived directly from *Ramos,* in which the requirements of the eighth amendment and the due process clause were collapsed into a common analysis. Eighth amendment jurisprudence, however, provides a critical insight into the substance of the fundamental interest at stake.

As the Supreme Court recently reaffirmed in *McCleskey v. Kemp*[40] the eighth amendment forbids "states [to] limit the sentencer's consideration of *any relevant circumstance* that could cause it to decline to impose the [death] penalty. In this respect, the state cannot channel the sentencer's discretion, but must allow it consider *any relevant information* offered by the defendant."[41] Alternative sentences and what, in reality, they mean constitute just such relevant information and circumstances. Although such information does not relate directly to a defendant's character or record, it is an integral part of the calculus sentencers use to determine whether a life sentence will suffice to ensure that a particular defendant, convicted of a particular crime, will pose a continued threat to society.

In most jurisdictions, courts sentence noncapital defendants. In such circumstances the trial judge properly instructs the jury to determine guilt or innocence without considering the sentence that might be imposed, for sentencing is the duty of the court. In capital cases, however, sentencing becomes the duty of the jury alone, either by voting directly on the penalty or, as in Texas, by determining the existence of factors that require its imposition. Thus, in Texas, the capital sentence cannot be imposed unless the state proves three issues beyond reasonable doubt and the jury answers, "Yes," to each of these questions:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.[42]

A juror's answer to the second question would certainly be influenced by his impression of when the defendant will again become a member of society. Those who decide the answer to such a question should know not only the meaning of the inquiry but all facts the defendant reasonably believes relevant to the answer.

---

**39.** 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980).

**40.** —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). *See also Hitchcock v. Dugger,* —— U.S. ——, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 113, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 602, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973

(1978) (plurality opinion); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion).

**41.** —— U.S. at ——, 107 S.Ct. at 1774 (emphasis added).

**42.** Tex.Code Crim.Proc.Ann. art. 37.071 (Vernon Supp.1987).

## C.

This court has recently held that the failure of counsel for a defendant to advise a sentencing court of sentencing alternatives constitutes ineffectiveness of counsel and, hence, a denial of due process.[43] We have also held that a defendant who raises a genuine issue as to the sentencing judge's knowledge and understanding of the range of sentencing discretion is entitled to a hearing before a new judge in order to determine whether the sentencing judge failed to exercise informed discretion.[44] If due process ensures that a judge must fully understand his sentencing options, the necessity of providing such information to a jury exists a fortiori. For Texas to deny a defendant the opportunity to present information about parole eligibility is, therefore, to limit his decision to bring to the sentencer's consideration relevant information and circumstances that might cause the jury to decline capital punishment. The practice is unconstitutional both because it denies him due process and because it subjects him to what amounts to arbitrary infliction of the death penalty.

Nonetheless, "in the absence of intervening and overriding Supreme Court decisions,"[45] one panel of this court is not free to overrule another. Although *McCleskey* sets forth principles of eighth amendment jurisprudence that we believe are fundamentally inconsistent with *O'Bryan*, those principles predate our decision in that case. Therefore we believe that, until *O'Bryan* is overruled en banc, its holding and rationale remain the law in this circuit.

## IV.

On the second day of King's trial, a fire broke out in the courthouse and all present were required to evacuate. The bailiff handcuffed King and other defendants together in a chain and evacuated them from the building. Although he took precautionary measures to prevent the jurors from seeing King, two of the jurors saw King in handcuffs outside the courthouse. After the jury had returned its verdicts of guilt and punishment, King's counsel learned of this incident and filed a motion for a new trial, contending that the incident deprived King of an impartial jury and undermined his right to a presumption of innocence. At the hearing, the two jurors who had seen King in handcuffs, Mary Ann Kirtley and Thomas Thompson, both testified unequivocally that their brief and unplanned exposure to King while he was in handcuffs did not in any way influence or affect their deliberations. Moreover, both jurors testified that there had been no discussion in the jury room about their seeing King outside the courthouse in handcuffs. The state court implicitly concluded that King suffered no prejudice from this incident.

We find no reason to disagree with the state court's conclusion. "[T]he Constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation ... [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.'"[46] This circuit has determined "that brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial, and defendants bear the burden of affirmatively demonstrating prejudice."[47] Because King has failed to show any prejudice resulting from his brief

**43.** *Burley v. Cabana,* 818 F.2d 414 (5th Cir. 1987).

**44.** *See Anderson v. Jones,* 743 F.2d 306, 308 (5th Cir.1984); *Williams v. Maggio,* 730 F.2d 1048, 1049 (5th Cir.1984); *Hickerson v. Maggio,* 691 F.2d 792, 794–95 (5th Cir.1982).

**45.** *White v. Estelle,* 720 F.2d 415, 417 (5th Cir. 1983).

**46.** *Rushen v. Spain,* 464 U.S. 114, 118, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983) (quoting *Smith*

*v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982)).

**47.** *United States v. Diecidue,* 603 F.2d 535, 549 (5th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (citing *Wright v. Texas,* 533 F.2d 185, 187 (5th Cir.1976)). *Accord United States v. Webster,* 750 F.2d 307, 331 (5th Cir.1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985); *United States v. Escobar,* 674 F.2d 469, 479 (5th Cir.1982); *Grantling v. Balkcom,* 632 F.2d 1261 (5th Cir. 1980).

exposure in handcuffs before these two jurors, he has not established that the incident deprived him of his constitutional right to a fair trial.

## V.

Because we have held that King is entitled to be resentenced due to the trial court's improper infringement on voir dire, we do not reach his contention that he was unconstitutionally denied the right to represent himself during the penalty phase of his trial.

For the reasons stated above the order of the district court is affirmed in part and reversed in part and a writ of habeas corpus granted. The State shall be given the option either of retrying or resentencing the petitioner within 120 days, as may be appropriate under Texas law.[48]

EDITH H. JONES, Circuit Judge, dissenting:

The majority have held that King is entitled to be resentenced because the trial court erroneously refused to allow voir dire on the possibility of parole associated with a life sentence. I respectfully dissent, because this holding has no direct support in Supreme Court authority; conflicts with Fifth Circuit precedent; is logically unsound; and even if it did raise a constitutional issue should be resolved under the harmless error standard.

No one doubts that King has the constitutional right, under the sixth and fourteenth amendments, to be tried by a fair and impartial jury. *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965). The issue before us, however, is the extent to which a federal appellate court, remote in time and place from the jury selection process, can or should declare that King did not have an impartial jury because the trial court refused the following defense request:

"... to voir dire each and every prospective juror on the question of being convicted of capital murder and in the event of a life sentence that person has to serve 20 years before becoming eligible for parole in light of the fact the prospective juror is advised the mandatory sentence for capital murder is life or death."

Neither the Supreme Court nor our Court has countenanced such Monday-morning quarter backing of jury selection in state or federal trials.

## I.

The majority's explanation of the constitutional overlay on the scope of voir dire is far too expansive. The general rule is that:

The Constitution does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him. [*Ham v. South Carolina*, 409 U.S. 524, at 527–28, 93 S.Ct. 848 at 850, 35 L.Ed.2d 46 (1973).]

Voir dire "is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Connors v. United States*, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895); *See Ham, supra*, 409 U.S., at 527–28, 93 S.Ct., at 850; *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931). This is so because the "determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Rideau v. Louisiana*, 373 U.S. 723, 733, 83 S.Ct. 1417, 1423, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting). *Ristaino v. Ross*, 424 U.S. 589, 594–95, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976). In *Rosales-Lopez v. United States*, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981), the Court observed that, "[b]ecause the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire." Thus, unlike the majority, I find no general constitutional rule that "limits on voir dire that create an unrea-

---

**48.** *See Brown v. Estelle*, 591 F.2d 1207 (5th Cir. 1979).

sonable risk of bias or prejudice infecting the trial process violate due process." A more accurate depiction of Supreme Court caselaw is that only voir dire concerning racial prejudice and death-qualification rises to a level of constitutional significance.[1]

The cases from which the majority take their inspiration, *Turner v. Murray*, 476 U.S. 1, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), and *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) espouse no principle permitting wide-ranging constitutional limits on voir dire. To the contrary, both of those cases are firmly rooted in a federal habeas court's special responsibility to enforce the fourteenth amendment's prohibition of racial discrimination. *Ham* held that, under all the circumstances, including the defendant's defense that law enforcement officers had framed him in retaliation for his active and well-known participation in civil rights activities, he was constitutionally entitled to question prospective jurors about their racial prejudice. But, as later explained by the Supreme Court, *Ham* did not constitutionalize racial voir dire interrogation in every case involving a minority defendant. *Ristaino v. Ross*, 424 U.S. at 596, 96 S.Ct. at 1021; *Rosales-Lopez v. United States*, 451 U.S. 182, 190, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1981). In both of those cases, the defendant was held not entitled to make such inquiries. *Rosales-Lopez* made this point clearly:

"... there is no per se constitutional rule in such circumstances requiring inquiry as to racial prejudice. (citation omitted). Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion.

*Absent such circumstances, the Constitution leaves it to the trial court, and the judicial system within which that court operates, to determine the need for such questions."*

101 S.Ct. at 1635 (emphasis added).

*Turner v. Murray*, 476 U.S. 1, 106 S.Ct. 1683, 1688, building explicitly on *Ham*, holds "that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 106 S.Ct. at 1688. *Turner* equates its holding with "other cases involving 'special circumstances'". *Id.* *Turner*'s requirement thus relates only to voir dire on racial prejudice in capital cases, defining such cases as a "special circumstance" envisioned by *Ham*.

It cannot be over-emphasized that *Ham* constitutionalized the voir dire inquiry only as to racial prejudice. The petitioner in *Ham* sought permission to interrogate the jurors not only about race but also about the fact that he wore a beard. A seven-member Court majority rejected this request in the following terms:

"While we cannot say that prejudice against people with beards might not have been harbored by one or more of the potential jurors in this case, this is the beginning and not the end of the inquiry as to whether the fourteenth amendment required the trial judge to interrogate the prospective jurors about such possible prejudice. Given the traditionally broad discretion accorded to the trial judge in conducting voir dire, *Aldridge v. United States, supra,* and our inability to constitutionally distinguish possible prejudice against beards from a host of other possible similar prejudices, we do not believe the petitioner's constitutional rights were violated when the trial judge refused to put this question."

409 U.S. 524, 527–28, 93 S.Ct. 848, 851. We must recall that *Ham*'s trial and conviction occurred in the late 1960's and early 1970's, at the apogee of student and political activism, when the wearing of a beard might well have been thought to prejudice many

---

1. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), of course, constitutionally controls the qualification of jurors to serve in death penalty cases, but this standard also defers to the trial court's credibility choices. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The majority here have bypassed the trial court's approval of King's jury as impartial.

prospective jurors. Nevertheless, *Ham* declined to constitutionalize this issue.

*Turner v. Murray* cannot be divorced from this history of deferential treatment of voir dire. Neither *Turner*, nor the Supreme Court capital case opinions on other issues that the majority cite, support their unprecedented extension of federal authority to review jury voir dire.

A similarly narrow interpretation of Supreme Court precedent results from a different analytical perspective.

Voir dire admittedly "plays a critical function in assuring the criminal defendant that his sixth amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634. As *Rosales-Lopez* notes, however, there are two functions of voir dire: it exposes veniremen who will not be able impartially to follow the court's instructions and evaluate the evidence, and it facilitates the defendant's exercise of peremptory strikes. The former function is served by *Witherspoon, Ham, Ristaino*, and *Turner*. The Court has, however, recognized that the second function need not be carried out by exercising federal review over individual answers to every question asked or sought to be asked of the jury panel. "The Constitution does not always entitle a defendant to have questions posed ... specifically directed to matters that might conceivably prejudice him." *Ristaino*, 96 S.Ct. at 1020 (citing *Ham*). *Ham*, in my view, eschewed constitutionalizing the second function of voir dire when it refused to require questions about prejudice against people with beards. In fact, it could be concluded that because there is considerable doubt about the existence of a federal constitutional right to exercise peremptory challenges, *Rosales-Lopez*, 101 S.Ct. at 1634 n. 6, there should in any event be no constitutional review of questions designed to facilitate the exercise of peremptory strikes. Our court, rejecting a challenge to a Texas court's voir dire in a capital case, expressed the limits on federal review of discretionary voir dire as follows:

"One purpose of voir dire is to gain information important to the exercise of peremptory challenges. Yet, and perhaps nearly always, another purpose is to provide a spring-board for the advocate.... *But usefulness to counsel*, whose persuasive skills otherwise find procedural expression, *is not [a] constitutional right ...*"

*Milton v. Procunier*, 744 F.2d 1091, 1095–96 (5th Cir.1984), *cert. denied* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985) (emphasis added).

As will be seen, the inquiry sought by King falls within that type of voir dire intended to facilitate peremptory strikes or simply provide an advocate opportunity to observe the demeanor of the witness. Because inquiry on the jurors' knowledge of parole laws is tenuously related to exposing a fatal bias, it lies closer to prejudice against people with beards than to racial prejudice and is therefore outside the spectrum of constitutional right.

## II.

This Circuit has provided no assistance to the majority's position. On the contrary, we held in *Milton v. Procunier*, 744 F.2d 1091, 1096 (1984), "that a trial court must be accorded wide leeway in its control over the trial scene, particularly voir dire. That deference is owed by a court charged with a responsibility of direct review. As a federal habeas court, even more remote in time, distance, and function the debt of deference is greater." We reviewed the state court's limit on voir dire in that capital case under the abuse of discretion standard. Previously, in *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir.1983), we held that "Moreno's contention that he should have been able to examine the jury on the possible range of punishment simply does not present a federal constitutional claim." The majority neither cite nor distinguish the controlling effect of these cases.

## III.

Logic does not support constitutionalizing a voir dire inquiry on parole laws. What such an inquiry would reveal is questionable, and whether it would help the defendant is even more questionable. Moreover, mandating such an inquiry conflicts with the Texas policy, heretofore sanctioned by the Supreme Court, of forbidding juror consideration of parole.

The significance of questioning veniremen on their conceptions of parole laws pales by comparison with the Supreme Court cases. In *Ham,* the publicity surrounding the defendant, his civil rights activism and his alleged drug offense created an intuitively obvious potential connection between racial bias and an adverse jury verdict. Likewise, in *Turner v. Murray,* as the Supreme Court analyzed it, the broad scope of punishment authority conferred on the jury by Virginia's capital punishment statute afforded "... a unique opportunity for racial prejudice to operate but remain undetected." 476 U.S. 1, 106 S.Ct. at 1687. In this case, no such connection can be inferred. One must first assume, as the majority do, that prospective jury members believe that a defendant convicted of capital murder may receive parole from a life sentence; that if he is entitled to parole the defendant will necessarily be released back into society; that his release will occur relatively soon; that given the possibility of parole he will remain dangerous to society; that therefore only the death penalty exacts proper retribution; and that the trial court's repeated admonitions concerning a mandatory life sentence and against considering parole have no practical influence. With no evidence in the record to support this string of inferences, the majority conclude that "widely held misconceptions about the actual effect of imposing a life sentence raise an unacceptable risk that the death penalty may be imposed on some defendants largely on the basis of mistaken notions of parole law."

One may hypothesize at length about the potential, subliminal bias caused by jurors' misconceptions of parole law. The majority's argument would apply equally to any misconception about applicable law, e.g. the reasonable doubt standard, the availability of appellate review, or the defendant's failure to testify. If a misconception exists, it is no different from any other particular influence on jurors such as their personal experiences with the legal process or whether they recently saw "Dirty Harry". I simply do not see how we can constitutionalize the inquiry about jurors' views of parole laws without constitutionalizing practically every other discrete inquiry made of prospective jurors.

Moreover, unlike racial prejudice, or an inability conscientiously to apply a capital murder statute, it is not self-evident that such an inquiry would aid the defendant. If King's counsel really suggested to prospective jury members that although they might award a mandatory life sentence, King could return to society in 20 years via parole,[2] he could easily predispose them against such a sentence given the egregious circumstances of this capital case. The view that revealing the possibility of parole to the jury is detrimental to the defendant is shared by a majority of the states, which decline to allow juror consideration or instructions concerning parole. *California v. Ramos,* 463 U.S. at 1013–14, 103 S.Ct. at 3460 n. 30. Texas is among those states.[3] *Munroe v. State,* 637 S.W.2d 475 (Tex.Crim.App.1982). In *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the state sought to enforce an instruction informing the jury of the possibility that a capital defendant's life sentence could be commuted, because the *state believed* this information would influence the jury's determination of the future dangerousness of the defendant and increase the likelihood of a death penalty. Thus, paradoxically, King's requested voir dire would play into the hands of those who wanted the jury to know that a capital murder convict may not really be imprisoned for life.

Herein lies the additional problem in King's position. *Ramos* decided that whether jurors are informed by instruction of the state's parole laws raises no constitutional issue. Although California's Briggs Instruction accordingly escaped constitutional condemnation, the Court observed that states could enforce a stricter

---

2. Tex.Code Crim.Proc.Ann. art. 42.12, § 3f(a)(1)(A) and § 15(b). (Vernon 1979) (Deleted Sept. 1, 1985).

3. Texas juries are now instructed on and may consider the possibility of parole for certain felonies, but not in capital cases. In addition, juries may not consider how parole would be applied to a particular accused. Tex.Crim.Proc. Code Ann. art. 37.07 § 4 (Vernon Supp.1986).

standard of preventing jury instruction on parole. It seems inconsistent to require voir dire of the jury on parole issues as a constitutional matter, while holding that the far more significant right of the state to frame jury instructions governing commutation in capital sentencing raises no constitutional issue. *California v. Ramos,* 103 S.Ct. 3446. The inconsistency is obvious. In *Munroe,* the Texas Court of Criminal Appeals held, "it would be improper for punishment to be based on an expectation that clemency powers would be exercised, and it would be unconstitutional [i.e. an interference by the judicial branch of state government with the function of the executive branch] to attempt to delay the exercise of the clemency powers or to avoid the possibility of granting parole by increasing punishment in anticipation thereof." 637 S.W.2d at 477, *quoting Sanders v. State,* 580 S.W.2d 349, 351 (Tex.Crim.App.1978). Conducting voir dire on jurors' concepts of parole, contrary to this reasonable state policy, raises the issue explicitly in their minds. Once raised, the inquiry reifies the majority's prophecy that even a subsequent instruction will not erase the issue from jurors' minds. Protecting King's alleged constitutional right to voir dire on parole may well deprive him of the benefit of the generous Texas policy forbidding jurors from considering parole.

### IV.

My final disagreement with the majority lies in their determination that this allegedly unconstitutional restriction on voir dire requires that King be resentenced. They draw this requirement from the considerably different case of *Turner v. Murray,* in which voir dire concerned the uniquely sensitive issue of racial prejudice. Here, any error in voir dire was rendered harmless by the court's charge. *See Moreno v. Estelle,* 717 F.2d at 178–79. The court charged the jury at punishment:

> You are instructed that the punishment for capital murder is by death or confinement in the penitentiary for life.

---

4. Because the court, in my view, should not remand for resentencing it is unnecessary to opine at length about this court's prior decision

> You are not to discuss among yourselves how long the accused would be required to serve the sentence that you impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and the governor; and are no concern of yours.

King did not object to these instructions. Surely the court's unequivocal instruction to the jury cured them of the desire to bring improper or erroneous conceptions of parole to bear in their decisionmaking. The instruction essentially said, as the state contends, that "Life means life."

In this connection, I would add that King's concern about the juror's beliefs regarding parole laws must be regarded as a makeweight argument. The transcript of voir dire in this case occupies 1,500 pages, and the jury selection process took several days, including the interrogation of three or four dozen prospective jurors. It flies in the face of common sense to suggest that asking each juror this one additional question or series of questions would have yielded a significantly more trustworthy jury panel than did the process employed by the trial court. Reason is strained to suggest that King's attorney was fatally disabled from exercising his peremptory strikes.[4]

I respectfully DISSENT.

### ON SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, and JONES, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the suggestion for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

---

in *O'Bryan v. Estelle,* 714 F.2d 365 (5th Cir.1983) with whose result and reasoning I agree.